My name is Matthew Hoppeck. I represent the petitioner, Alou Ndiaye. His name is sort of hard to pronounce. I'll say petitioner for the rest of the argument. This is a case about inadmissibility, the rules that determine who can be admitted to the United States. And one of the primary protections in our inadmissibility statute is that people who have supported terrorists can't be admitted to the United States. There's no dispute that Mr. Ndiaye petitioner has an approved visa petition based on a marriage that still exists. And the reason his adjustment of status was denied was a determination by the agency that he had given what the statute calls material support to a terrorist organization. The immigration statute is quite broad in this respect because it includes not just terrorist organizations, but groups that have subgroups that engage in terrorist activities. And the primary question before the court is, what's a subgroup? How do we figure it out? And did the agency do what it was supposed to do to determine that this was a subgroup? There's some other issues, but that's what I want to talk about first. The statute doesn't define subgroup. The board has never defined subgroup. This court hasn't had a chance to. But there's a series of published and unpublished decisions that I think are helpful. It's helpful, I think, to start with the statute's text. Congress used the word subgroup on purpose. It defined terrorist organizations to include groups that use the organization's name, uses the word subgroup. The Third Circuit in the Udine decision talked about what that means, that Congress chose to talk about groups instead of individuals. And Udine, it said that if Congress had decided to say a terrorist organization is any organization whose members engage in terrorist activities, then anytime your members engage in terrorist activities, the group is responsible. Because Congress limited it to subgroups, the Udine court, I think correctly, determined that there has to be a level of acknowledgement, sanction. I think the Seventh Circuit decision in Hussain's has sanctioned assent, some kind of an agreement that we agree with what these folks are doing. Would that analysis be the same for group and subgroup in terms of distinguishing between the group engaging or the subgroup engaging in the activity versus individuals engaging in the activity? I wondered about this this week. I could envision somebody from my church starting to blow things up and saying, I'm doing it on behalf of this church. You wouldn't say the church is now a terrorist organization unless there has been some sort of an acknowledgement or an assent or even silence. Udine talks about silence might be enough. But you wouldn't, and I think the position that Attorney General takes, at least in part in their briefing, is that that's really all that's required, is that there's a group that identifies itself as a subgroup that is doing terrorist activities. So the authorization, that's what you're urging the court to take on, correct? I think so. A standard that there needs to be some evidence of authorization of the particular acts that are identified. And so it seems to me that to apply that to the subgroup, you'd almost have to apply that same analysis given the statute to the group as well, that it's a sort of a two-step. I think that's right. I don't think Udine court, the decision is somewhat short. I don't think it went to that depth, but I think I agree that both the group and the subgroup would need to be in agreement. So what else would you, the subgroup still has, is something different, obviously, than the group. So even assuming that there's some kind of authorization for both, even if we assume that, is there more in terms of, where do we find the guidance to define a subgroup? Because the authorization, I think, seems to come from what you're talking about in the statute itself, which is distinguishing between the group and the individual. Where do we get guidance to help us understand how to decide whether something's a subgroup or not? Yeah, I start with the text. I think the word sub means subsidiary, which I think necessarily means there's an agreement there that we belong to each other. But the Udine court talked about how the board probably should publish a decision on this issue, because so far it talked about how it had read about 50 unpublished decisions, and the board's cases had largely agreed that there needed to be an acknowledgment, but some of them didn't agree. We could find guidance there, but I also think the court could just read the statute and determine that by using those words, by using subgroup, Congress intended some kind of an agreement or sanction or silence or something like that. Has the bureau ever tried to create a list of terrorist organizations? There are lists of tier one and tier two organizations. Tier three is the catch-all, and so it's not defined by the organization, it's defined by the things that you can know about them. So do they engage in terrorist activities? And we agree this is not a tier one or tier two organization. That's right. And has there been any prior cases which have designated this particular organization liberation for the people of Casamance? I think it's, am I probably not pronouncing that correctly? None that I know of. I cite two in a footnote in my brief, the only ones we could find in Westall that talked about MFDC. Neither of them say it was a terrorist group, but I don't think it was alleged. One problem that the Udine court talks about is that the board's unpublished decisions are not generally available. In fact, the Udine court asked the Department of Justice Attorney, give us all of your cases about this particular group, and found that it was quite difficult for them to gather those decisions. They're not all in one place. The immigration judge in that case had said, there's never been a case about this group, and it turns out there have been about 50. But what the court, when it finally read those decisions, said about half the time, the board says, this particular group, there's 50. No, not MFDC, it's talking about another one, but that the board had said about half the time this is a terrorist group, and about half the time they had said it's not. The point I'm trying to make is, I don't think there's been that kind of clarity with this or any other group, because the board's unpublished decisions don't really track each other, and it's hard to find them. I've filed a FOIA request, I'll just share, with respect to this group and the board's decisions, and have been told the board has no way to search its own decisions by keyword, so they can't give me the decisions that say whether MFDC is a terrorist group or not. So I think subgroup implies acknowledgement or agreement or whatever verb we want to use. I also think that there's a second rule about... Well, in this case, though, didn't the IJ, though, basically said, you meet that requirement because he gave financial support, material financial support. Now, I know your argument turns a little bit on the word material, but... I don't think we dispute that that would be material. He gave about $800. If you gave $800 to Al Qaeda or ISIS, I would say that's probably material. He's supporting a terrorist organization. Our argument was more that the judge concluded, yes, he gave money, but the question is, did he give money to the terrorist organization or the other organization that has the same name? For our purposes, the board doesn't actually make a finding that this says as such. That's the totality of what the board says. So one thing that's missing is an explanation of why the agency concluded, perhaps with some of the rationale that Judge Malloy talked about, but perhaps not. It's just hard to know from the board's decision. I find compelling Judge Nettles' decision from 2009 because it's lengthy, and it talks at length about the record. She was able to observe his testimony at trial and determine whether it was credible or not. We put a lot of stake in the trial judge's observation of trial testimony, and I know a lot of my colleague's briefing talks about instances in that initial hearing where he admits that they were an armed group, but Judge Nettles had the benefit of being there and had read the whole transcript, and she explicitly concluded that he hadn't been aware that they were a violent group or that he hadn't joined a violent group. I think her decision is compelling. There's also a question of which decision got reviewed by the board. This is sort of an oddity that we only found by reviewing the record, but Judge Nettles' decision wasn't signed until 2014. That's at page 1311 of the record. She signed it two months after Judge O'Malley had signed his decision. But is that a straight-faced argument when they say, we again affirm, and you know how the 17 decisions are written? I don't know what it means. Yeah. It's odd to me. I just want to say that it's odd to me. The second issue in figuring out if you've given money to a terrorist organization is timing. So the group might be a terrorist organization now, but the agency needs to talk about when did it become a terrorist organization, and when did you give them money? And that's another thing that's missing from the board's decision here. There's a Third Circuit case called Rajabi that's, unfortunately, it's unpublished, but in Rajabi, the court talked about how Congress had used the word engages in, and that language implies that there's a time frame. Here, the board didn't address timing. Instead, it worded its decision in present tense. It said, the sentence is, the MFDC has multiple facets, as if we're talking about them today. The question, though, is, and there's a real challenge, when did they split up? When did they stop being a unified group? Because we know the date that Mr. Ndiaye joined the group, and we know the date that he stopped. Is it material that there was, I thought that the parties agreed there was a misstatement in the record as to when there was a break with the two groups? I think we agree that there's a misstatement. We disagree on the import. So we would argue Judge O'Malley's fact-finding is imperiled by his misapprehension of when the groups split up. I think my colleague has described that as harmless, but the article that Judge O'Malley cited, he said they had split up in 1999, and he relied on that to say, well, that's right around the time you're still a member. And it turns out they had split back in 1991. Both parties agree with that. And I noted that the Attorney General agreed with that as well. However, in Judge O'Malley's decision, he's also citing evidence from 2008 about bad things the MFDC is doing. That's at page 225 of the record. Mr. Ndiaye was here. He wasn't in Senegal. He wasn't sending money in 2008. So there's a real question, I think, about whether the board did the work necessary to address timing, address when was the material support given, and what was the terrorist group at the time. The third thing I want to raise, and I'll let my colleague talk, is the burden of proof. At the board, Mr. Ndiaye raised this issue that when terrorist material support issues arise, the Department of Homeland Security has the initial burden, and then once they meet, it's a low burden. Once they meet their burden, it shifts to the respondent. The immigration judge and the board seem to place the entire burden on Mr. Ndiaye. And unfortunately, the decision that's on review doesn't talk about the burden of proof or who met the burden of proof or whether the judge had shifted the burden. Those are the reasons, primarily, that we would ask the court to reverse. Thank you, Mr. Hoppe. Ms. Murphy. Thank you, Your Honors. And may it please the court, Lindsay Murphy on behalf of the Attorney General. Your Honors, the board here properly determined that the MFDC is a tier three terrorist organization. Two immigration judges and a three-member panel of the Board of Immigration Appeals all agree that evidence in the record clearly indicates that the MFDC has engaged in terrorist activities for decades. The petitioner tried to rebut this evidence by claiming that he belonged to an entirely separate, peaceful organization, but he cites absolutely no persuasive evidence to show that such a group even exists, much less that he belonged to it. All the petitioner really offers is his inconsistent and contradictory testimony. And to be not credible, and the board upheld the second immigration judge's credibility determination. Ms. Murphy, what's your response to Mr. Hoppe's argument that you could have a humanitarian or some other organization that has members that commit terrorist acts in the name of the organization? Does that automatically make the organization a terrorist group? Here's the argument of his, if his local, if somebody in his local church decided to commit some terrorist activity and said, I'm doing it in the name of religion. Does that make it a terrorist organization? Yes, Your Honor. And according to the broad language of the terrorism statute, it would, or it would at least be sufficient to indicate that there is evidence in the record indicating that the group qualifies as a terrorist organization. So even if just one member, if just one member commits a terrorist act in the name of the organization, that automatically makes it a terrorist? That makes everyone else who's a member of that organization at that point have to decide, well, I'm going to have, I'm going to get out of this group, or I'm going to drop this religion or whatever? Your Honor, I don't know that one member would be sufficient. We, we don't have a definition for subgroup, but what the board, or excuse me, what the statute does clarify is that a group consists of at least two or more individuals. And so I think one could safely assume that subgroup would also have to be at least more than one member. And my colleague discusses the Third Circuit. And while we would discourage the court from adopting such an authorization statute, what, what I will say is that the Third Circuit was more concerned with the activities of rogue members, of individual members. And that was, that was the case with BNP of individual, of rogue individuals taking actions, which they said were done on behalf of the BNP. And, and the court concluded there that it can't be said that the acts of any single members can not be committed. And here, Petitioner is not citing to any violent activities committed by single members. They're, they're by distinct factions of the MFDC, which may be working in concert, which may not be. It's really unclear. And, and honestly, that's, that's really consistent with the nature of a terrorist organization. Oftentimes they do not act in a concerted manner. They are disorganized for a purpose, so as to insulate any cells or subgroups from criminal prosecution, so as to be able to carry on their activities when, when other factions may have been apprehended and prosecuted. So the, the purpose of Congress in drafting such a broad re-language statute is to account for this amorphous nature of terrorist organizations. Then how, how do you look at the subgroup? So even if, if, if we can adopt what you're saying is true, doesn't the word subgroup have to have some separate meaning and separate analysis to determine whether in fact it is actually sub to this group that is defined either the way you've said it or the way Mr. Hoppe has argued it should be defined? I don't think so. I mean, there's, there's no, there's no plain requirement there that there be in the statute that there be authorization. And so I think what Congress was doing was just trying to account for the fact that terrorist organizations often act in, in smaller groups. And so the smaller groups may not be acting in concert with one another. And as the statute says, a group of individuals, whether organized or not. And so it recognizes that oftentimes there may be smaller factions of a larger group that are engaging in violent activities. And just because these factions are engaging, are, are, are committing violence, shouldn't, just because they're, they're not acting in an organized fashion, shouldn't insulate the entire group and prevent them from being designated as a terrorist organization. Well, and, and that, accepting even all of that, of what you say is true, I still am struggling with how to define a subgroup. How do you, how do you determine what's the factual analysis or legal analysis that the immigration judge would go through to determine whether or not this actually is a subgroup of what is a terrorist organization or is just something separate and on its own? I, I think, well, at least in this case, Your Honor, it would be groups that identify with the MFDC. And so, or, or groups whose, who, or, for example, many of the, the, the background documents in the record describing violent acts attribute the violence to either the MFDC in general or to splinter groups or factions of the MFDC. And so here there's, there's no real dispute as to who is committing these actions. They're, they're all linked to the MFDC in some manner. They're all referred to as the MFDC and they're all seem to be committing violence in the name of the MFDC. And I'll also remind the court that petitioner has not cited any evidence to show that any of these groups referenced in the background documents in the record, none of them are shown to be entirely peaceful. None of them. So in this case, the, the, the, even if there were an authorization requirement, which there isn't, the board and the immigration judge didn't need to go into an analysis of, of what constituted a subgroup and whether they had authorization, because at the end of the day, they're all violent. Going back to something you mentioned earlier, Ms. Murphy, I want to make sure I understand. Did you say that if any one subgroup is classified as a terrorist organization, the whole group is? Yes, your honor. According to the language of the statute. Yes. So you cannot have an organization that may have a purely humanitarian aspect to it that's identified as a group of individuals, say running a hospital and a separate organization or a separate subgroup that has terrorist activities. In that situation, the humanitarian part would also be a terrorist organization. Yes, your honor. And unless the petitioner were able to show that it were an entirely separate group. But the reason, the reason. How does that, how does that play into something like Islam? If, if you have individual mosques where you may have some terrorist activity ongoing, does that make the whole religion a terrorist organization? No, your honor. It doesn't. But I, I think in, in this case, and what we're talking about are, are just discrete organizations that are, that are, that don't encompass something as broad as an entire religion, but discrete organizations such as the MFDC. And I will say that the Supreme Court and humanitarian law project noted the reason for, for why support of a peaceful faction of a group is, is, is still, should still constitute unlawful material support. And that is because support given to a group's nonviolent wing tends to free up other resources within the organization that may be put to, put to violent ends. And then such support also helps lend legitimacy to the terrorist group as a whole, including the violent actions that that group undertakes. And there's also good reason to believe that foreign terrorist organizations don't maintain legitimate financial firewalls between funds raised for humanitarian purposes on the one hand, and those ultimately used for, to violent ends. And so because of this, because of the very nature of terrorist groups, I think Congress thought it appropriate to draft such a broad statute where even support to a peaceful humanitarian wing would be sufficient to constitute support of a terrorist organization as a whole. We didn't lose you, did we, Ms. Murphy? Oh, no, I'm here, Your Honors. I'm sorry. I was just regrouping here. No, that's okay. We can't tell. I also wanted to note in response to my colleague's argument that it's unclear from the agency decisions what time – or whether they considered a relevant time period in analyzing whether the MFDC is a terrorist organization. I think his argument is incorrect. It's clear from Immigration Judge O'Malley's decision, the second immigration judge, while he did cite a 2008 country report, he also noted – he did that in noting that the use of violence has been consistent since at least, I think, 1997, which is what he said. So it's clear from the immigration judge's decision that he considered the entire time period in which the petitioner claimed to have been affiliated or providing support to this MFDC group. And the board upheld Judge O'Malley's terrorist organization designation in part on that basis. I would also like to clarify, while Judge O'Malley did rely on a typo in the record that says that the MFDC had not split apart at the time that the petitioner joined, I think his argument actually is harmless. My understanding and reading of the background evidence is that the MFDC had formed in 1982, had split into two factions in 1991, that those two factions were unified in 1996, and that the petitioner had joined the group in 1998. So in essence, what the immigration judge was saying was that the petitioner had joined the group when it was unified, when there were like supposedly a political – separate political and military wings that had unified and were while the immigration judge understood the record to say that the split occurred after the petitioner joined, so in 1999. What the record actually indicates is the split occurred before the petitioner joined, but then those two wings regrouped and reunified prior to 1998, which is the date that the petitioner joined. So at the end of the day, the petitioner joined a unified group that had both military and political components working together in conjunction. Well, under your analysis, does it make any difference? Because if I'm understanding your, the government's argument, it sounds like a faction is just another name for a subgroup. And so what difference does it make if he joined it when it was separated or if he joined it when it was reunified? Well, it doesn't really make any difference, Your Honor, particularly because there's nothing in the record to show that either faction was actually entirely peaceful, while one faction was engaged more politically and they had abided by a ceasefire and were engaging politically with the Senegalese Government. They also maintained their arms during that entire period and they maintained control of an entire swath of land that they refused to let Senegalese – the Senegalese Government come onto, and they maintained that by – through the show of force, at least – or the threat of force, I should say. Let's see. Your Honor, if there are no further questions for the government, I think I've addressed everything that I had intended to address. Okay. The bench has no more questions, so therefore, your argument's complete. Mr. Hoppe? I don't think it would be helpful to go page by page through the record, but I don't find the argument about there being no evidence that one MFDC was peaceful to be accurate. All of those page citations are in our briefing, but the first argument – or the second argument Ms. Murphy made was that there's no evidence that we're talking about rogue members. That's just not true. There is an article at page 1988 in the record that talks about the timeline and specifically talks about the violent section of the MFDC as a, quote, ragtag group estimated at between 300 and 1,000 poorly armed and clothed men and boys. That article goes on to talk about how there's a peaceful version that was actually negotiating with the government, the government was willing to sign peace treaties with them, they were not engaged in violence, and that the government was unwilling to negotiate with the violent version of that group. It's not the only article, but it addresses what Ms. Murphy raised as there being no evidence in the record about this really involving rogue elements, people that claim to use the name MFDC but then go do things that the organization has spoken out about. Even the board, I think, talked about how the two groups do have different leaders, different ideologies, but then it said we can rely on a subgroup. As such, we conclude that you gave material support to a terrorist organization. At a minimum, I think there's more work for the board to do. We would ask the court to send the case back for the board to at least do that modicum of work. We disagree with the conclusion that if any member, or Ms. Murphy said two members, of a group split off and start committing violent acts in the name of the group, that that becomes a subgroup. I think Judge Posner's analysis in the Hussein case out of the Seventh Circuit is compelling because he talks about what do you do when you're part of a group and one of your members just starts killing people. The quote from Hussein was, if it's not approved by the organization, perhaps that's not a quote. Judge Posner's analysis was that if the organization hadn't approved it, then it shouldn't be the responsibility of the organization that someone has committed terrorism in their midst. The last thing I wanted to talk about was timing. Ms. Murphy's response was that Judge O'Malley had gotten the timing, had considered the actual timing, so it's not so necessary that the board did not, but the decision on appeal is the board's decision and the board's decision talks in present tense about things that should be in past tense. It's a question and it's not clear that the board apprehended the exact timeline here. And then the final point that Ms. Murphy made was about the 1999 reference and that that reference was harmless because it's a typo, but Judge O'Malley explicitly relied on 1999 because that was the window in which the petitioner had joined. It's not a harmless reference and if it were harmless, the board could have corrected it, but then the board didn't. So we're left with an incomplete record, an incomplete story. We would ask the court to remand. Thank you, Mr. Hoppe. Case number 18-1135 is submitted for decision. Ms. Boehm, the next case.